NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**JOHN MEZZALINGUA ASSOCIATES, INC. (DOING BUSINESS AS PPC, INC.),**
*Appellant,*

v.

**INTERNATIONAL TRADE COMMISSION,**
*Appellee.*

---

2010-1373

---

On appeal from the United States International Trade Commission in Investigation No. 337-TA-650.

---

Decided: April 28, 2011

---

RICHARD L. STROUP, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, of Washington, DC, argued for appellant. With him on the brief were DON O. BURLEY and TROY E. GRABOW. Of counsel on the brief were JAMES R. MULDOON and DENIS J. SULLIVAN, Marjama Muldoon Blasiak & Sullivan LLP, of Syracuse, New York.

DANIEL E. VALENCIA, Attorney, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for appellee. With him on the brief were JAMES M. LYONS, General Counsel and MICHELLE W. KLANCNIK, Assistant General Counsel.

---

Before BRYSON, DYK, and PROST, *Circuit Judges.*

PROST, *Circuit Judge.*

This patent appeal comes to us from the International Trade Commission ("ITC"). John Mezzalingua Associates, Inc. (d/b/a PPC, Inc.) ("PPC") contends that the ITC erred in holding that PPC failed to satisfy the technical prong of the domestic industry requirement of § 337. Tariff Act of 1930 § 337(a)(2), 19 U.S.C. § 1337(a)(2) (2006). PPC argues that the ITC misconstrued the term "engagement means" in the patent-in-suit, and that this error led it to the wrong outcome on domestic industry. We agree, and so *reverse* and *remand.*

## I.  Background

This appeal concerns U.S. Patent No. 5,470,257 ("'257 patent") entitled "Radial Compression Type Coaxial Cable End Connector." The described invention is a connector for attaching a coaxial cable to a threaded peg on a television, cable box, or other equipment:



*Id.* at fig.1. A technician who uses the invention partially strips a coaxial cable 12 and places it into locking member 26. Then, he squeezes the locking member 26 so that it slides into the connector body 22. This puts the device into a "closed" or "clamped" position in which the coaxial cable is securely held. *Id.* at col.4 l.32–col.5 l.10.

This case concerns claim 1, which reads:

> 1. An end connector for connecting a coaxial cable to a system component, said end connector comprising:
>
> a connector body comprising a tubular inner post extending from a front end to a rear end, and including an outer collar surrounding and fixed relative to said inner post at a location disposed rearwardly of said front end, said outer collar cooperating in a radially spaced relationship with said inner post to define an annular chamber with a rear opening;
>
> fastener means at the front end of said inner post for attaching said end connector to said system component;

a tubular locking member protruding axially into said annular chamber through said rear opening; and

engagement means circumscribing the interior of said outer collar and the exterior of said locking member, said engagement means coacting in circular interengagement to inseparably couple said locking member to said connector body at a first position and to accommodate limited axial movement of said locking member relative to said connector body between said first position and a second position, said locking member coacting in a first radially spaced relationship with said inner post when in said first position to accommodate insertion of the rear end of said inner post into an end of said cable, with a central core portion of said cable being received in said inner post through said rear end and an outer annular portion of said cable being received in said annular chamber through said rear opening and between said locking member and said inner post, and said locking member coacting in a second radially spaced relationship with said inner post when in said second position to grip the outer annular portion of said cable therebetween.

*Id.* col.5 l.58–col.6 l.23. The issue before us is the proper construction of the term "engagement means," which appears at the start of the final paragraph above.

In April 2008, PPC asserted the '257 patent, among others, in an ITC complaint against eight respondents, none of whom are part of this appeal and four of whom ultimately defaulted.[1]     The ITC instituted an investigation, *Certain Coaxial Cable Connectors and Components Thereof and Products Containing Same*, Inv. No. 337-TA-650 (hereinafter "*Certain Coaxial Cable Connectors*").   Institution of Investigation, 73 Fed. Reg. 31,145 (May 30, 2008).  Following an evidentiary hearing, Administrative Law Judge ("ALJ") Gildea found that the defaulting respondents had violated § 337.   The ALJ concluded that a domestic industry existed in the '257 patent and specifically held that PPC's "CMP" connector practiced all elements of claim 1.  Initial Determination on Violation, *Certain Coaxial Cable Connectors*, slip op. at 105–08, 2009 WL 3694421 (USITC Oct. 13, 2009) (hereinafter "Init. Determ.").

Upon reviewing the Initial Determination, the ITC adopted a different construction of claim 1's "engagement means" limitation than ALJ Gildea.  Comm'n Op., *Certain Coaxial Cable Connectors*, slip op. at 32 (USITC Mar. 31, 2010) (hereinafter "Comm'n Op."); *see also* Comm'n Op. (Public Version), 2010 ITC LEXIS 570 (USITC Apr. 14, 2010).  Based on this new construction, the ITC concluded that PPC's CMP connector did not practice the "engagement means" limitation of claim 1, and so concluded that PPC had not satisfied the technical prong of § 337's domestic industry requirement as to the '257 patent.  Comm'n Op. at 40–41; *see also* Tariff Act of 1930, § 337(a)(2), 19 U.S.C. § 1337(a)(2) (2006).   It therefore

---

[1]     It is the potential § 337 violation by these four defaulting respondents that gives rise to the present appeal. PPC does not seek a finding of violation by any of the other respondents.  Appellant's Br. 7–8.

concluded that no violation had occurred as to the '257 patent.

PPC timely appealed.[2] We have jurisdiction under 28 U.S.C. § 1295(a)(6).

## II. Discussion

### A. Standard of Review

This court reviews the ITC's claim construction determinations de novo. *Checkpoint Sys., Inc. v. Int'l Trade Comm'n*, 54 F.3d 756, 760 (Fed. Cir. 1995). The determination of whether a device practices a patent claim (properly construed) is one of fact, reviewed under the substantial evidence standard. *Oak Tech., Inc. v. Int'l Trade Comm'n*, 248 F.3d 1316, 1325 (Fed. Cir. 2001).

### B. Claim Construction

Section 112, paragraph 6 of the Patent Act provides for the use of "means-plus-function" limitations in patent claiming. 35 U.S.C. § 112, ¶ 6; *see also Lockheed Martin Corp. v Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003). When construing a means-plus-function limitation, the claim "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6.

---

[2] The other patents raised before the ITC are not part of this appeal. It is proper for a party to timely appeal a final decision of the ITC on a subset of asserted patents; there is no need to wait for final resolution concerning the other patents. *Allied Corp. v. Int'l Trade Comm'n*, 782 F.2d 982, 983–84 (Fed. Cir. 1986).

The parties agree that the term "engagement means," as used in claim 1, is a means-plus-function limitation. They further agree that the function of this "engagement means" tracks the language of claim 1, and is as follows:

> to inseparably couple said locking member to said connector body at a first position and to accommodate limited axial movement of said locking member relative to said connector body between said first position and a second position . . . .

'257 patent col.6 ll.7–11. We agree with this straightforward identification of the claimed means and function in the claim text. We now must interpret them "in light of the corresponding structure" from the patent. *In re Donaldson Co., Inc.*, 16 F.3d 1189, 1193 (Fed. Cir. 1994) (en banc).

The parties' dispute turns on the precise reach of the structure corresponding to the "engagement means." The ITC held that the corresponding structure was as follows:

> [A] first and second axially spaced, radially protruding, circular shoulders 50a *and 50b* circumscribing the exterior of the locking member 26, each shoulder being configured and dimensioned to coact in circular interengagement with an internal groove circumscribing the interior of the outer collar 30, and where the first radially protruding circular shoulder has a generally perpendicular rear face and an inclined ramp-like front face.

Comm'n Op. at 32 (emphasis added). PPC argues that the ITC erred in holding that "second shoulder 50b" is part of the structure for the "engagement means" limitation.[3] The parties make several arguments, all of which derive from the patent.

In defense of its construction, the ITC points out that one function of the "engagement means" is "to accommodate limited axial movement of said locking member relative to said connector body between said first position and a second position." Appellee's Br. 29 (citing '257 patent col.6 ll.4–23). The ITC makes two arguments from this recitation of function. First, the ITC argues that the engagement means must "accommodate limited axial movement *between the first and second positions.*" *Id.* at 35 (emphasis added). It points to the specification to argue that the "first" position is when the claimed connector is "open" and the "second" position is when it is "clamped." *Id.* It notes that "shoulder 50b is integral to the claimed engagement means because it defines the claimed second position in conjunction with groove 52." *Id.* at 37. If there were no second shoulder, argues the ITC, "there would be no second position and the locking member 26 could move forward beyond any potential second position." *Id.*

PPC disagrees, and so do we. Comparing an embodiment in which shoulder 50b is present (as the ITC would require) to one in which it is not shows why. In both embodiments, shoulder 50a will prevent the locking member from falling backwards out of the connector body. That much is not in dispute. But, the ITC points out, in

---

[3] The ITC held that PPC's proffered domestic industry product lacks a structure corresponding to the "second shoulder 50b," or any equivalent. Comm'n Op. at 39–41.

the two-shoulder embodiment shoulder 50b defines the "second" position and prevents the locking member from moving too far forward. We view the single-shoulder embodiment as not relevantly different. In that embodiment, even though shoulder 50b is not present, the locking member will not be able to move forward beyond the second, "closed" position because as the locking member moves forward into the connector body, it will eventually contact the interior annular face of the outer collar. The two-shoulder embodiment would tend to minimize such contact, but we do not view minimization of contact between these faces as a necessary aspect of either the claimed invention generally or the "engagement means" specifically. In short, shoulder 50a "accommodates" forward movement between the first and second positions; shoulder 50b does not perform that function.

Second, the ITC notes that the specification, describing the preferred embodiment, cites both shoulder 50a and second shoulder 50b as part of the "engagement means." *Id.* at 35 (discussing '257 patent col.4 ll.11–22). Citing *NOMOS Corp. v. BrainLAB USA, Inc.*, 357 F.3d 1364, 1368 (Fed. Cir. 2004), the ITC argues that because the sole disclosed embodiment includes a second shoulder 50b as part of the "engagement means," it is appropriate to require second shoulder 50b as essential structure for the "engagement means" limitation. *Id.* at 39.

PPC again takes a different view. It argues that the "engagement means" limitation should be construed to include only what is necessary to perform the function, and not import structures that, though present in the preferred embodiment, are not actually necessary. *See Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).

Once again we agree with PPC. While the ITC is correct that second shoulder 50b is part of the preferred embodiment of the '257 patent, we do not view it as "necessary" to the function of the "engagement means" for the reasons set forth above. Claim interpretation under § 112, ¶ 6 does not "permit incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

Finally, the ITC argues that the dependent claims of the '257 patent require that the claimed connector, once it is "closed," should not easily reopen. Appellee's Br. 48 (discussing, inter alia, dependent claim 4); *see also, e.g.*, '257 patent col.6 ll.33–35 ("4. The end connector of claim 3 wherein said engagement means additionally coacts to fix said locking member at said second position."). PPC notes that the word "additionally coacts" in claims 2–4 was added during prosecution, and argues that such addition would not have been necessary if fixing the connector in position was a necessary aspect of the engagement means.

We agree again with PPC. We see no reason in this case why any dependent claim should require narrower reading of the independent parent. That the patentee used dependent claims to address a feature of "fixing"/"locking"/"snap engag[ing]" (as in claims 2–4 and 10) the claimed connector in position does not mean his independent claims must be limited to structures embodying this feature. In our view, the independent claim, properly interpreted, encompasses both connectors that have features to keep the connector in the "closed" second position and those that do not.

Based on the above, we hold that the ITC erred in determining the structure corresponding to the claimed

"engagement means." We further hold that ALJ Gildea correctly construed this term. Init. Determ., slip op. at 105–08. The required structure for the claimed "engagement means," consistent with ALJ Gildea's Initial Determination, is as follows:

> A first radially protruding circular shoulder (50a) having a generally perpendicular rear face and an inclined ramp-like front face circumscribes the exterior of the locking member (26) and coacts in circular engagement with an internal groove (52) circumscribing the interior of the outer collar (30).

Init. Determ., slip op. at 37-38.

### C. Violation of § 337

Having construed the "engagement means" term, we turn to resolution of the present appeal. The ITC held that the sole obstacle to finding violation of § 337 as to the defaulting respondents was the ITC's conclusion that PPC had not satisfied the technical prong of § 337's domestic industry requirement. Comm'n Op. at 40–41. That conclusion was based on the ITC's erroneous construction of "engagement means," which we have reversed.

Neither PPC nor the ITC disputes that, having construed the "engagement means" in the same manner as ALJ Gildea, we have removed the final bar to finding violation of § 337 as to the defaulting respondents. We therefore enter judgment of violation as to those

respondents and remand for further proceedings consistent with this opinion.[4]

## REVERSED AND REMANDED

---

[4] We decline PPC's invitation to go further and to direct entry of a General Exclusion Order against the defaulting respondents. *See* Appellant's Br. 56–57. Such a step would be premature, at least because the ITC has not made findings on the proper remedy and bonding.